**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RINGCENTRAL, INC.,                                   No. C-09-02693 JCS

          Plaintiff,

    v.                                         **REPORT & RECOMMENDATION RE**
                             **PLAINTIFF'S MOTION FOR ENTRY OF**
BILL QUIMBY, ET AL.,                                 **DEFAULT JUDGMENT AND**
                             **PERMANENT INJUNCTION [Docket No.**
          Defendants.                                **29]**
_____/

## I.     INTRODUCTION

In this trademark infringement action, Plaintiff RingCentral, Inc. brings a Motion for Default Judgment and Permanent Injunction ("Motion") in which it seeks default judgment, an award of damages, attorneys' fees and costs and a permanent injunction against Defendants Bill Quimby and TollFreeNumbers.com, Inc.  A hearing on the Motion was held on Friday, February 5, 2010 at 9:30 a.m.  For the reasons stated below, it is recommended that the Motion be GRANTED in part and DENIED in part.

## II.     BACKGROUND

Plaintiff is a California corporation with its principal place of business in San Mateo, California.  Compl. ¶ 5.  "RingCentral is a telecommunications company providing telephone system service, including the registration and management of toll free numbers, to individuals and small businesses throughout the entire United States."  *Id.* ¶ 10.  It owns the marks "RingCentral" ("the Mark") and "1800RingCentral" ("the 800 Mark"), both of which are registered with the U.S. Patent

United States District Court

For the Northern District of California

and Trademark Office.[1]  *Id.* ¶ 11, 13.  Registration of the Mark was applied for in 1994 and approved in 1995; registration of the 800 Mark was applied for in 2007 and approved in 2008.  Compl. ¶ 11, 13.  In addition, Plaintiff operates a website to advertise and promote its products at the domain name www.ringcentral.com.  *Id.* ¶ 12.

Plaintiff filed the Complaint in this action on June 17, 2009, naming Bill Quimby, TollFreeNumbers.com, and Does 1-50 as Defendants.  In the Complaint, Plaintiff alleges that Bill Quimby is an individual residing in the state of New York and TollFreeNumbers.com is a New York corporation with its principal place of business in Yonkers, New York.  *Id.* ¶ 6-7.  Plaintiff alleges that Defendants maintain a website at www.tollfreenumbers.com which offers similar products and services to RingCentral, such as the registration of 800 numbers.  *Id.* ¶ 16.  The website allegedly "offers '800' numbers, '800' vanity numbers and '800' premium numbers" and "offers customers the ability to look up available '800' and vanity numbers and activate those numbers for use in exchange for a monthly fee."  *Id.*  Quimby also allegedly maintains other websites that enable customers to use toll free phone numbers, such as www.billquimby.net.  *Id.* ¶ 14.

According to the Complaint, Defendants registered the domain names www.800ringcentral.com and www.1800ringcentral.com on or about April 18, 2003.  *Id.* ¶ 15; Declaration of Vladimir Shmunis in Support of Plaintiff's Motion for Default Judgment and Permanent Injunction ("Shmunis Decl.") ¶ 8 & Ex. E (database showing registrant of domain names).  Users who visit those websites are diverted to Defendants' website at www.tollfreenumbers.com.  Compl. ¶ 15.  Plaintiff claims that at the time Quimby registered the domain names he knew of the existence of Plaintiff's use of the Mark to identify its products and services, *id.*, and that he intentionally registered domain names using Plaintiff's mark to divert customers interested in acquiring Plaintiff's services to Defendants' website, Plaintiff's Memorandum of Law in Support of Motion for Default Judgment and Permanent Injunction ("First Supp. Mem.") at 2.  Plaintiff also alleges that on or about August 18, 2004, Quimby registered a toll free vanity number corresponding to "1800RINGCENTRAL" and callers are diverted to Quimby or

---

[1]Registration numbers 1914669 ("RingCentral") and 3550956 ("1800RingCentral")

a business entity related to Quimby.  Compl. ¶ 17.  Further, Plaintiff alleges that Defendants have made false and misleading statements regarding Plaintiff's products and services on their website. *Id.* ¶ 18.  Finally, Plaintiff alleges that Quimby has made other unauthorized uses of the Mark on websites owned or controlled by Defendants and in publications promoting Defendants' products or services.  *Id.* ¶ 19.

On or about October 8, 2008, Plaintiff sent a letter to Defendants requesting that they cease and desist infringing uses of the Mark, and demanded that Quimby transfer the www.800ringcentral.com and www.1800ringcentral.com domain names to Plaintiff.  *Id.* ¶ 20; Declaration of John Marlow in Support of Plaintiff RingCentral, Inc.'s Second Supplemental Memorandum of Law in Support of Motion for Default Judgment and Permanent Injunction ("Second Marlow Decl.") ¶ 2 & Ex. A.  Plaintiff's California address was located at the bottom of the letter.  Second Marlow Decl. ¶ 2 & Ex. A.  Additionally, John Marlow, Vice President of Corporate Development and General Counsel for Plaintiff, spoke to Quimby numerous times about the infringing activity.  *Id.* ¶ 4.  Quimby refused to cease the infringing activity on or about October 20, 2008, *id.* ¶ 3, and instead offered to stop routing customers through the domain names to Defendants' websites if Plaintiff would agree to post a link on its website to promote Defendants' products and services, Compl. ¶ 20.

The summons and Complaint were personally served on Defendants on July 17, 2009. Declaration of Peter L. Weber in Support of Plaintiff's Request to Enter Default ("Weber Decl. Supp. Entry of Default") ¶ 3-4 & Ex. 1, 2.  Quimby sent a letter to the Court dated August 14, 2009 in response to the Complaint.  In the letter Quimby claims that "[a]ll of the allegations made by RingCentral are entirely false."  Quimby Letter at 1.  Quimby admits that he registered the domain name www.1800ringcentral.com but states that the site "has literally been just parked and never used or promoted in any way."  *Id.*  According to Quimby, TollFreeNumbers.com is not a competitor of Plaintiff because TollFreeNumbers.com "only help[s] customers get a toll free number" and does not actually provide toll free services.  *Id.* at 2.  Quimby states that TollFreeNumbers.com has listed Plaintiff as a provider of toll free service and that TollFreeNumbers.com has referred customers to Plaintiff.  *Id.*  While he has used his website to "write about and offer opinions on things related to

toll free service" including expressing opinions on Plaintiff, Quimby denies that he or TollFreeNumbers.com have used the domain name or mark "1800RingCentral" in any way. *Id.*

The Court accepted Quimby's letter as a responsive pleading and scheduled a case management conference for September 25, 2009.  When Defendants failed to appear, the Court issued an Order to Show Cause instructing Defendants to appear on October 23, 2009, to show cause why default should not be entered against them for failing to appear at the case management conference (Defendant Quimby), and for failure to "otherwise defend" pursuant to Fed. R. Civ. Pro. 55(a) and to retain counsel pursuant to Civ. L.R. 3-9(b) (Defendant TollFreeNumbers.com). Defendants did not appear on October 23, 2009 as instructed and the Court entered default under Fed. R. Civ. P. 55(a) on November 18, 2009.

Based on its allegations, Plaintiff asserts nine claims against Defendants in its Complaint: (1) trademark infringement under 15 U.S.C. § 1114; (2) unfair competition under 15 U.S.C. § 1125; (3) false advertising under 15 U.S.C. § 1125; (4) cybersquatting under 15 U.S.C. § 1125(d); (5) state law unfair competition; (6) trade libel; (7) intentional interference with contractual relations; (8) intentional interference with prospective economic relations; and (9) negligent interference with prospective economic relations.  Compl. ¶ 22-67; Motion ¶ 1.  Plaintiff seeks an injunction prohibiting Defendants from using the mark or any imitation, ordering the transfer of the domain names www.800ringcentral.com and www.1800ringcentral.com from Defendants to Plaintiff, and requiring Defendants to employ corrective advertising.  Compl. at 11-12; Motion ¶ 12.  Plaintiff also seeks $7,801,189.50 in damages and an award of $33,715.76 in attorneys' fees and costs.  Second Amended Declaration of Peter Weber in Support of Plaintiff RingCentral, Inc.'s Motion for Default Judgment and Permanent Injunction ("Second Weber Decl. Supp. Default J.") ¶ 10-11.

III.    **ANALYSIS**

A.    **Personal Jurisdiction**

As a preliminary matter, this Court must determine whether or not it has personal jurisdiction over Defendants Bill Quimby, a resident of New York, and TollFreeNumbers.com, Inc., a New York corporation.  *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) (holding that the court properly raised sua sponte the question of whether there was personal jurisdiction over Iraq before determining

4

United States District Court
For the Northern District of California

whether default judgment should be entered).  In *Tuli*, the Ninth Circuit explained that where a plaintiff seeks default judgment, the court may not assume the existence of personal jurisdiction, even though ordinarily personal jurisdiction is a defense that may be waived, because a judgment in the absence of personal jurisdiction is void.  *Id.*  Where there are questions about the existence of personal jurisdiction in a default situation, the court should give the plaintiff the opportunity to establish the existence of personal jurisdiction.  *Id.*

### 1.    Bill Quimby

Pursuant to Fed. R. Civ. P. 12(h)(1), "[a] general appearance or responsive pleading by a defendant that fails to dispute personal jurisdiction will waive any defect in service or personal jurisdiction."  *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986), *amended on other grounds*, 807 F.2d 1514 (9th Cir. 1987), *cert. denied*, 484 U.S. 870 (1987).  Defendant Quimby sent a letter to the Court in response to the Complaint which the Court accepted as his answer.  Quimby did not raise the defense of lack of personal jurisdiction in his letter, therefore Quimby has waived this defense.  Accordingly, this Court may exercise personal jurisdiction over Quimby.

### 2.    TollFreeNumbers.com

Although a non-attorney may appear on his own behalf, he has no authority to appear as an attorney for others than himself.  *C.E. Pope Equity Trust v.United States*, 818 F.2d 696, 697 (9th Cir. 1987).  Corporations and other unincorporated associations must appear in court through an attorney.  *In re America West Airlines*, 40 F.3d 1058, 1059 (9th Cir. 1994) (citing *C.E. Pope Equity Trust*, 818 F.2d at 697-98).  Quimby is not a licensed attorney and therefore has no authority to appear on behalf of Defendant TollFreeNumbers.com.  Because Quimby's letter to the Court does not constitute an appearance or responsive pleading on behalf of TollFreeNumbers.com, personal jurisdiction over TollFreeNumbers.com must be analyzed separately.

Under California's long-arm statute, Cal. Code Civ. Pro. § 410.10, federal courts in California may exercise jurisdiction to the extent permitted by the Due Process Clause of the Constitution.  *Panavision v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  The Due Process Clause allows federal courts to exercise jurisdiction where either: 1) the defendant has had continuous and systematic contacts with the state sufficient to subject him or her to the general jurisdiction of the

United States District Court

For the Northern District of California

court; or 2) the defendant has had sufficient minimum contacts with the forum to subject him or her to the specific jurisdiction of the court. *Id.* at 1320. Plaintiff alleges that TollFreeNumbers.com's activities in California are substantial, continuous, and systematic. Plaintiff RingCentral, Inc.'s Second Supplemental Memorandum of Law in Support of Motion for Default Judgment and Permanent Injunction ("Second Supp. Mem.") at 3. However, because Plaintiff has not pointed to facts indicating that TollFreeNumbers.com's contacts with California are continuous and systematic, and because this Court concludes that specific jurisdiction exists, the Court declines to find that it has general jurisdiction over TollFreeNumbers.com.[2]

Courts apply a three-part test in determining whether specific jurisdiction exists:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Id.* at 1320 (quoting *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995) (quotation marks omitted)).

In order to satisfy the first prong of the test, the defendant must have either purposefully availed himself of the privilege of conducting business activities within the forum or purposefully directed activities toward the forum. *Id.* Although the phrase "purposeful availment" is often used to refer to both purposeful availment and purposeful direction, the Ninth Circuit distinguished the two concepts in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *see also Brayton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985-86 (9th Cir. 2009). Purposeful availment typically consists of action taking place in the forum that invokes the benefits and protections of the laws of the forum, such as executing or performing a contract within the forum. *Schwarzenegger*, 374 F.3d at 802. Purposeful direction usually consists of actions outside the forum state that are directed at the forum and applies to suits sounding in tort. *Id.* at 803.

---

[2]The standard for establishing general jurisdiction is high, requiring that the defendant's contacts approximate physical presence. *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Plaintiff has not alleged facts that would support such a finding.

**United States District Court**

For the Northern District of California

1    Here, Plaintiff's claims are based in trademark infringement, generally characterized as a

2    tort, so personal jurisdiction may be found if TollFreeNumbers.com has purposefully directed its

3    activities at the forum.  *See Panavision*, 141 F.3d at 1322.  Purposeful direction exists when a

4    defendant has committed an act outside of the forum state that was intended to and does in fact cause

5    injury within the forum.  *Calder v. Jones*, 465 U.S. 783, 788-89 (1984).  Under the *Calder* "effects

6    test" the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum

7    state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.  *Brayton*,

8    575 F.3d at 986 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d

9    1199, 1206 (9th Cir. 2006)).

10                                  I)    **Intentional Act**

11    The intentional act element is satisfied when the defendant performs an act with the intent to

12    perform that act; the defendant need not have the intent to accomplish a result or consequence of the

13    act.  *Brayton*, 575 F.3d at 986.  Here, TollFreeNumbers.com performed intentional acts by

14    registering the domain names www.800ringcentral.com and www.1800ringcentral.com, by posting

15    statements about Plaintiff on its website, and by refusing to cease its infringing activities after notice

16    of Plaintiff's rights to the Mark and the 800 Mark.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284

17    F.3d 1007, 1020 (9th Cir. 2002) (operating a passive website was an intentional act).

18                                  ii)    **Express Aiming**

19    The defendant's conduct must be expressly aimed at the forum to satisfy the second part of

20    the effects test.  *Brayton*, 575 F.3d at 986.  A mere foreign act with foreseeable effects in the forum

21    is not sufficient; there must be "something more" to constitute express aiming, such as "'wrongful

22    conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'"  *Id.*

23    (quoting *Bancroft*, 223 F.3d at 1087).  The maintenance of a passive website alone does not satisfy

24    the express aiming requirement, but "operating even a passive website in conjunction with

25    'something more' – conduct directly targeting the forum – is sufficient." *Rio Props.*, 284 F.3d at

26    1020.

27    The effects test was applied in the context of the Internet in *Panavision*, 141 F.3d 1316.

28    There, the defendant, an Illinois resident, had registered a domain name using the plaintiff's

7

trademark, panavision.com (in fact, the defendant had registered domain names for many other companies as well, including Delta Airlines, Neiman Marcus, Eddie Bauer and Lufthansa). *Id.* at 1319. As a result, when the plaintiff sought to register the domain name panavision.com it discovered that it could not do so. *Id.* The plaintiff then sent the defendant a letter demanding that it stop using the plaintiff's trademark and the defendant, in turn, demanded a "settlement" of $13,000 in exchange for releasing the domain name. *Id.* When the plaintiff refused to pay, the defendant registered the domain name panaflex.com, another of the plaintiff's trademarks. *Id.* The plaintiff brought an action in California alleging trademark dilution, and the defendant moved to dismiss on the basis that the court lacked jurisdiction. Applying the "effects test," the district court found that it had jurisdiction, and the Court of Appeals affirmed. *Id.* at 1317.

The Ninth Circuit in *Panavision* went through the three-part test for specific jurisdiction to determine whether purposeful directed existed. *Id.* at 1320-23. The court concluded that while "simply registering someone else's trademark as a domain name and posting a web site on the Internet is not sufficient to subject a party domiciled in one state to jurisdiction in another . . . Toeppen engaged in a scheme to register Panavision's trademarks as his domain names for the purpose of extorting money from Panavision," and therefore satisfied the requirements of the effects test. *Id.* at 1322. The court also went on to conclude that the other requirements for specific jurisdiction had been met: the plaintiff's claims arose out of the conduct that gave rise to effects in California, and the exercise of jurisdiction was reasonable. *Id.*

The Ninth Circuit also found the effects test to be satisfied in *Brayton*, 575 F.3d 981. There the defendant had posted copyrighted material from the plaintiff's website on its own website without authorization. *Id.* at 984. The defendant did not reside, conduct any business, or own any property in the forum. *Id.* The court found that the defendant had committed an intentional act by posting the infringing material on its website and that the express aiming element was satisfied because the defendant had individually targeted the plaintiff, who the defendant knew to be a resident of the forum. *Id.* at 986-87. By taking copyrighted material from the plaintiff's website and posting it onto its own website for the purpose of competing with the plaintiff and with the knowledge that the plaintiff was a forum resident, the defendant was held to have expressly aimed its

1   conduct at the forum.  *Id.* at 987.

2       Here, Plaintiff has alleged that TollFreeNumbers.com knew Plaintiff to be a resident of

3   California as of October 8, 2008, when Plaintiff sent a cease and desist letter to

4   TollFreeNumbers.com on RingCentral letterhead.  Second Supp. Mem. at 4; Second Marlow Decl. ¶

5   2 & Ex. A.  Plaintiff further alleges that Quimby knew of Plaintiff's use of the Mark when he first

6   registered the domain names on behalf of TollFreeNumbers.com, and that TollFreeNumbers.com

7   offers products and services similar to those provided by Plaintiff.  Compl. ¶ 15-16.  According to

8   Plaintiff, TollFreeNumbers.com intentionally registered the domain names using the Mark to divert

9   customers looking for Plaintiff's website to the TollFreeNumbers.com website, First. Supp. Mem. ¶

10  12, TollFreeNumbers.com posted false and misleading statements about Plaintiff on its website,

11  Compl. ¶ 18, and TollFreeNumbers.com refused to cease its infringing activity after numerous

12  contacts with Plaintiff, Second Marlow Decl. ¶ 3-4.  This constitutes sufficiently wrongful conduct

13  targeted at Plaintiff, whom TollFreeNumbers.com knows to be a resident of the forum state.  *See*

14  *Brayton*, 575 F.3d at 986 (quoting *Bancroft*, 223 F.3d at 1087).  Accordingly, the Court finds that

15  TollFreeNumbers.com has expressly aimed its activities at the forum.

16                  **iii)        Foreseeable Harm**

17      A defendant must know that its conduct is likely to cause harm in the forum.  *Brayton*, 575

18  F.3d at 988.  This element is satisfied when the defendant's intentional act has "foreseeable effects"

19  in the forum.  *Id.*  Here, it was foreseeable that Plaintiff would be harmed by

20  TollFreeNumbers.com's infringing activity and that the harm would occur in Plaintiff's principal

21  place of business, California.

22      The Court finds that TollFreeNumbers.com's contacts with California are sufficient to show

23  purposeful direction.  TollFreeNumbers.com committed an intentional act when it refused to cease

24  its infringing activities after notice of Plaintiff's rights in the Mark and the 800 Mark.  These acts

25  were expressly aimed at California because they involve wrongful conduct targeted at a known

26  resident of this forum.  And because Plaintiff is located in California it was foreseeable that the use

27  of Plaintiff's Mark would cause harm in California.  In addition to purposeful direction, the Court

28  concludes that the second and third requirements to exercise specific jurisdiction are also met with

**United States District Court**

For the Northern District of California

1  respect to Defendant TollFreeNumbers.com: Plaintiff's claims arise out of TollFreeNumbers.com's

2  forum-related activities (infringement of Plaintiff's Mark), and the exercise of jurisdiction is

3  reasonable.

### B.   Legal Standard Regarding Entry of Default Judgment

5  Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, the court may enter a

6  default judgment where the clerk, under Rule 55(a), has previously entered the party's default based

7  upon failure to plead or otherwise defend the action.  Fed. R. Civ. P. 55(b).  A defendant's default,

8  however, does not automatically entitle the plaintiff to a court-ordered default judgment.  *Draper v.*

9  *Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986).  The district court has discretion in its decision to

10 grant or deny relief upon an application for default judgment.  *Aldabe v. Aldabe*, 616 F.2d 1089,

11 1092 (9th Cir. 1980);  *Lau Ah Yew v. Dulles*, 236 F.2d 415, 416 (9th Cir. 1956) (affirming district

12 court's denial of default judgment).  The court may consider the following factors in deciding

13 whether to enter a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of
> plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
> the sum of money at stake in the action; (5) the possibility of a dispute
> concerning material facts; (6) whether the default was due to
> excusable neglect, and (7) the strong policy underlying the Federal
> Rules of Civil Procedure favoring decisions on the merits.

18 *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

19 In considering the sufficiency of the complaint and the merits of the plaintiff's substantive

20 claims, facts alleged in the complaint not relating to damages are deemed to be true upon default.

21 *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); Fed. R. Civ. P. 8(d).  On the other

22 hand, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.

23 *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  As a result,

24 where the allegations in a complaint are not "well-pleaded," liability is not established by virtue of

25 the defendant's default and default judgment should not be entered.  *Id.*

26 Damages or other forms of relief awarded are constrained by the rule that judgment by

27 default "must not be different in kind from, or exceed in amount, what is demanded  in the

28 [complaint]."  Fed. R. Civ. P. 54(c).

United States District Court

For the Northern District of California

**C.     *Eitel* Factors**

**1.     Possibility of Prejudice to Plaintiff**

To the extent that Defendants have failed to appear in and otherwise defend this action, Plaintiff will be left without a remedy if default judgment is not entered in its favor.  This factor therefore favors entry of default judgment.

**2.     Excusable Neglect**

There is no evidence in the record that Defendants' failure to appear and otherwise defend was the result of excusable neglect.  Rather, Defendants failed to appear after the Complaint in this action was personally served upon them and again failed to appear as instructed by this Court's Order to Show Cause, indicating that their failure to appear was willful.  This factor favors entry of default judgment.

**3.     Allegations and Substantive Merits of Claims[3]**

**I)     Trademark Infringement**

Plaintiff alleges that Defendants have infringed on the Mark and the 800 Mark in violation of the Lanham Act, 15 U.S.C. § 1114.  To prevail on a trademark infringement claim, a holder of a registered service mark must show that another person is using: (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion, or to cause a mistake or to deceive.  15 U.S.C. § 1114(1)(a); *Century 21 Real Estate Corp. v. Sanlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  Neither intent nor actual confusion are necessary to establishing a likelihood of confusion.  *Id.*  The critical determination is "whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes that product."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (quoting *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 908 (9th

---

[3] In its Second Supplemental Memorandum of Law in Support of Motion for Default Judgment and Permanent Injunction, Plaintiff dismissed its state law claims of unfair competition, trade libel, intentional interference with contractual relations, intentional interference with prospective economic relations, and negligent interference with prospective economic relations.  Accordingly, this Court only reaches Plaintiff's claims of trademark infringement, federal unfair competition, false advertising, and cybersquatting.

United States District Court

For the Northern District of California

Cir. 2003)) (quotation marks omitted).

The Ninth Circuit employs an eight factor test in determining the likelihood of confusion. *Jada*, 518 F.3d at 632. The factors include: (1) strength of the mark; (2) proximity of goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Id.* Here, Plaintiff has alleged that the Mark has been registered since 1995 and used to advertise its products on its website since 1999; that the Mark is used in conjunction with similar and some identical services offered by Defendants; that both Plaintiff and Defendants' services are marketed over the Internet; that the domain names registered by Defendants contain the Mark and the 800 Mark; and that Defendants have used the domain names containing Plaintiff's marks to redirect Internet users searching for Plaintiff's website to Defendants' website. Plaintiff's allegations point to a strong likelihood of confusion, therefore Plaintiff has established that Defendants infringed upon Plaintiff's trademarks and Plaintiff is entitled to entry of default on this claim.

### ii)   Unfair Competition

Plaintiff alleges that Defendants' use of the Mark and the 800 Mark constitutes Unfair Competition under 15 U.S.C. § 1125(a). This section provides in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). Because Plaintiff holds registered trademarks on the Mark and the 800 Mark, the elements Plaintiff must meet to state a claim for unfair competition are the same as those required to show trademark infringement: (1) Defendants must have used the protected marks "in commerce," and (2) that use must be likely to confuse or misrepresent to consumers the

United States District Court

For the Northern District of California

characteristics of goods or services.  *Herman Miller Inc. v. Alphaville Design Inc.*, No. C 08-03437, 2009 WL 3429739, at *6 (N.D. Cal. Oct. 22, 2009) (citing *Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 853-53 (9th Cir. 2002)).  To the extent that Plaintiff has established use in commerce and a likelihood of confusion on its trademark infringement claim, Plaintiff is also entitled to entry of default on its Unfair Competition claim.

### iii)    False Advertising

Plaintiff alleges that Defendants' false and misleading statements made on Quimby's websites about Plaintiff's products and services and Defendants' competing products and services constitute False Advertising under 15 U.S.C. § 1125(a).  To prevail on a false advertising claim under § 1125(a), Plaintiff must prove that Defendants "used [Plaintiff's] mark in commercial advertising or promotion to misrepresent the nature, characteristics, qualities, or geographic origin of [Plaintiff's] goods."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002).  Here, Plaintiff has alleged that Defendants made the following false and misleading statements about Plaintiff in connection with Plaintiff's Mark: (1) that Plaintiff is "misleading"; (2) that "the RingCentral website and salespeople try to hide the truth"; (3) that Plaintiff "published a misleading survey" and "their conclusions are ultimately invalid"; and (4) that Plaintiff's "misleading and false conclusions" are "a sign of dishonesty."  Declaration of John Marlow in Support of Plaintiff RingCentral, Inc.'s Supplemental Memorandum of Law in Support of Motion for Default Judgment and Permanent Injunction ("Marlow Decl.") ¶ 8 & Ex. A.  Plaintiff further alleges that its business reputation has been harmed by Defendants' defamatory statements and provides evidence of at least one customer who has been mislead by Defendants' statements.  *Id.* ¶ 10-11 & Ex. A (email to Plaintiff from a potential customer who "was concerned when the owner of tollfreenumbers.com spoke so strongly against dealing with ringcentral, and attacked both the organizations [sic] operations and integrity, especially the leadership").  Plaintiff has properly alleged all of the elements of a cause of action for false advertising and is therefore entitled to entry of default on this issue.

### iv)    Cybersquatting

Plaintiff alleges that Defendants' registration and use of domain names that incorporate the

13

United States District Court
For the Northern District of California

Mark violates the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).

The Act states:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> (I) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that–
>
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> >
> > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> >
> > (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).

To prevail on its claim for cybersquatting under the ACPA, Plaintiff must establish the following elements: 1) that the Mark and the 800 Mark are distinctive marks entitled to protection; 2) that the domain names registered by Quimby are identical or confusingly similar to Plaintiff's marks; and 3) that Quimby registered the domain names with a bad faith intent to profit from them. *See Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). Registration of a mark is prima facie evidence that the mark is distinctive and thus this element is satisfied. *See* 15 U.S.C. § 1057(b); *see also Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992).

In determining whether there is a likelihood of confusion under the ACPA, courts compare the plaintiff's mark with the name of the website. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004) (holding that there was a likelihood of confusion under the ACPA where defendant had registered websites including www.my-washingtonpost.com, www.mymcdonalds.com and www.drinkcoke.org); *see also Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567 (E.D. Pa. 2002) (holding that plaintiff owning Louis Vuitton mark was entitled to default judgment on ACPA claim based on defendant's use of domain name www.LouisVuitton-replicas.com); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505 (E.D. Va. 2003) (holding that

United States District Court

For the Northern District of California

plaintiff owning GMAT mark was entitled to default judgment on claim under ACPA where defendant used domain names www.GMATPLUS.com and www.GMATPLUS.net and was selling past test questions from the Graduate Management Admission Test (GMAT)).  A court should not look beyond the domain name to consider the content of the website.  *Purdy*, 382 F.3d at 783.  "The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement."  *Id.*  Consequently, even if it might be evident from the content of the website that it is not sponsored by or affiliated with the plaintiff, there may nonetheless be a violation of the ACPA.  *Id.*; *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) (holding that domain name www.peta.org violated the ACPA because it was identical to the mark of the plaintiff, People for the Ethical Treatment of Animals, even though a visit to the site itself revealed that it was a parody and that the initials "peta" stood for People Eating Tasty Animals).

On the other hand, if the name of the website at issue itself makes clear that it is not affiliated with the plaintiff's mark, there can be no likelihood of confusion.  *See, e.g., The Taubman Co. v. Webfeats*, 319 F.3d 770, 777 (6th Cir. 2003) (holding that there was no likelihood of confusion on part of plaintiff who owned Taubman mark where defendant operated website with domain name www.taubmansucks.com); *Bally Total Fitness Holding Co. v. Faber*, 29 F. Supp. 2d 1161 (C.D. Cal. 1998) (holding there was no likelihood of confusion on part of plaintiff owning Bally mark where defendant operated website with domain name www.ballysucks.com).

Plaintiff has alleged and provided evidence that it owns the Mark and that it is distinctive.  *See* Shmunis Decl. Ex. A, B, D (USPTO electronic trademark searches).  It has also alleged and provided evidence that Defendants have registered domain names that are confusingly similar to the Mark.  *See Broadbridge Media, L.L.C. v. Hypercd.com*, 106 F. Supp. 2d 505, 510 (S.D.N.Y. 2000) (holding that domain name "hypercd.com" was confusingly similar, if not identical, to mark "HyperCD").  Finally, Plaintiff has provided evidence that Quimby refused to transfer the domain names to Plaintiff even though Quimby claims the domain names are not in use, offering instead to stop routing customers through the domain names to Defendants' website if Plaintiff would promote Defendants' products on its website.  There is no evidence that Defendants had any intellectual

1    property rights in the "RingCentral" mark prior to registering the domain names, and the domain

2    names do not consist in any way of the legal name of either Defendant.  This evidence is sufficient

3    to establish a bad faith intent to profit from the mark.  *See id.*; 15 U.S.C. § 1125(d)(1)(B) (listing

4    factors that may be considered in determining whether there is a bad faith intent to profit).

5    Accordingly, the allegations and evidence support entry of default judgment in favor of Plaintiff on

6    its cybersquatting claim.

7                 **4.**        **Conclusion**

8        Based on consideration of the factors discussed above, it is recommended that default

9    judgment be entered against Defendants on its trademark infringement, unfair competition, false

10    advertising, and cybersquatting claims.

11    **D.**       **Remedies**

12              **1.**        **Injunctive Relief**

13        Plaintiff requests that the Court grant a permanent injunction barring Defendants from further

14    interfering with Plaintiff's business.  In particular, Plaintiff requests entry of the following

15    injunction:

16        Defendants, their officers, agents, servants, attorneys, employees, privies, successors and
          assigns, and all holding for and through them, and all persons in active concert or
17        participation with any of them be enjoined from:

18        a. Using, displaying, advertising, copying, registering, imitating, or infringing upon the
          RingCentral Marks;
19

20        b. Using or displaying the RingCentral Marks or name or colorable imitations thereof as a
          business name, domain name or mark in any written, oral or electronic advertisements,
          including on its www.tollfreenumbers.com website and any other websites owned and/or
21        controlled by Defendants;

22        c. From using RingCentral or any other word that is confusingly similar to RingCentral as or
          as part of any trademark, service mark, brand name, trade name, or other business or
23        commercial designation, in connection with the sale, offering for sale, distribution,
          advertising or promotion of any product or service;
24

25        d. Making representations that Defendants' products or services are in any way sponsored,
          approved, authorized or affiliated with Plaintiff;

26        e. Otherwise infringing upon Plaintiff's RingCentral Marks.

27    Proposed Default J. And Permanent Inj. ("Proposed Order") ¶ 5.  Plaintiff also asks that Defendants

28    transfer the domain names www.1800ringcentral.com and www.800ringcentral.com and any other

United States District Court

For the Northern District of California

1  domain names using the RingCentral Mark to Plaintiff; that Defendants are prohibited from

2  contacting any customers or suppliers of Plaintiff; and that Defendants' employ corrective

3  advertising to rectify any damages caused by Defendants' false and misleading statements.

4  Proposed Order ¶ 6-8.

5      Injunctive relief is available to prevent future trademark infringement under the Lanham Act.

6  15 U.S.C. § 1116.  "Injunctive relief is the remedy of choice for trademark and unfair competition

7  cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing

8  infringement." *Century 21*, 846 F.2d at 1180.  In light of Defendants' failure to appear in this

9  action, injunctive relief is warranted.  This Court therefore recommends that Plaintiff's request for a

10  permanent injunction be granted.  However, Plaintiff did not request in its Complaint that

11  Defendants be prohibited from contacting any customers or suppliers of Plaintiff.  A court may not

12  grant relief that is different in kind from what is demanded in the complaint.  *See* Fed. R. Civ. P.

13  54(c).  Further, Plaintiff has not alleged any facts that evidence a need for Defendants to employ

14  corrective advertising.  Accordingly, the Court recommends that Plaintiff's request for an injunction

15  on these two bases be denied.

16          **2.      Damages**

17              **I)      Lost Profits**

18      The Lanham Act provides that a trademark owner may recover (1) defendant's profits, (2)

19  any damages sustained by the plaintiff, and (3) the costs of the action.  15 U.S.C. § 1117(a).

20  Because Plaintiff is unable to establish Defendants' profits due to Defendants' default, Plaintiff

21  seeks an award of damages equal to the amount of lost profits attributable to Defendants' infringing

22  activity.  To recover damages under § 1117(a), a plaintiff must prove both the fact and the amount of

23  damages.  *Lindy Pen Co. v. Bic Pen Corp.*, 14 U.S.P.Q. 2d 1528, 1531 (C.D. Cal. 1989) *aff'd*, 982

24  F.2d 1400 (9th Cir. 1993).  A plaintiff may establish the amount of damages by showing the

25  plaintiff's lost profits or by showing the defendant's unjust enrichment in the form of profits

26  attributable to the infringing activity.  *Id.*  To establish lost profits as a measure of damages a

27  plaintiff must make a prima facie showing of reasonably forecast profits.  *Id.*  "As a general rule,

28  damages which result from a tort must be established with reasonable certainty. . . . '[D]amages are

not rendered uncertain because they cannot be calculated with absolute exactness,' yet, a reasonable basis for computation must exist."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

Plaintiff seeks to show the potential damages it has suffered from the loss of business attributable to search engine searches using the terms "800," "ringcentral," and "ring central." Declaration of Kathy Chueh in Support of Plaintiff's Motion for Default Judgment ("Chueh Decl.") ¶ 2.  Kathy Chueh, Corporate Controller for Plaintiff, states that when customers entered these or similar search terms in an internet search engine, Defendants' websites would appear as results.  *Id.* ¶ 4.  As a result, Plaintiff alleges that once Defendants registered the infringing domain names, customers searching for Plaintiff's website were diverted to Defendants' website.  *Id.* ¶ 6.  Chueh calculated the financial impact of this customer diversion by comparing the number of Plaintiff's users who were referred to Plaintiff or purchased services from Plaintiff as a direct result of Plaintiff's marketing efforts aimed at search engine users ("search engine users") to the number of Plaintiff's users from all other sources ("other users")  from 2002 to 2008.  *Id.* ¶ 8.

Since Defendants registered the infringing domain names in 2003, the percentage of Plaintiff's users made up of search engine users has decreased every year except 2004.  *Id.* ¶ 9 & Ex. B.  While the actual number of Plaintiff's search engine users has increased annually, the annual percentage growth of search engine users has not been commensurate with the percentage growth of other users.  *Id.* ¶ 11 & Ex. C.  Plaintiff argues that it should have had the same rate of growth in search engine users that it had in other users from 2003 to 2008, and that Defendants' infringing activities caused the loss of that growth.  *Id.* ¶ 12-13.

To establish the amount of its lost profits, Plaintiff takes the percentage growth rate of other users each year and assumes that, if it were not for Defendants' diversion of users to their website, the number of search engine users would have increased at the same rate.  *Id.* ¶ 14.  For example, in 2003 Plaintiff's other users increased 3,530% from 2002 (from 37 to 1,343).  *Id.* & Ex. B, C. However, Plaintiff's search engine users only increased 764% (from 163 to 1,408).  *Id.*  According to Chueh, if Defendants had not begun diverting users through the infringing domain names in 2003, Plaintiff's search engine users would have increased 3,530% that year (from 163 to 5,916).  *Id.*

18

United States District Court

For the Northern District of California

Chueh concludes that Plaintiff lost 4,508 users due to Defendants' infringing activity in 2003 (5,916 less 1,408).

Based on the cost of sales and operating expenses, Chueh calculated an estimate of how much Plaintiff receives, on average per year, from each customer who purchases its products (Average Sales Price, or "ASP"). *Id.* ¶ 7, 14 & Ex. A. Chueh then multiplied the number of lost search engine users in a year by the ASP received that year to measure the amount of lost profits for that year. *Id.* ¶ 14. Chueh calculates Plaintiff's ASP for 2003 as $430.99 and on that basis measures Plaintiff's lost revenue for 2003 as $1,943,083.10. *Id.* Chueh then calculated the gross profit lost based on the percentage of actual gross profit in relation to actual revenues, reaching $1,515,092.40 gross profit lost for 2003. *Id.*

Using the method described, Chueh calculated Plaintiff's total potential lost profits for the years 2003 to 2008 as follows: $1,515,092.40 for 2003; $387,992.79 for 2005; $1,425,199.92 for 2006; $1,291,105.36 for 2007; and $3,181,799.03 for 2008. *Id.* ¶ 14-19. Plaintiff does not attribute any potential loss of profits to 2004 because the growth rate of search engine users in that year exceeded that of other users. *Id.* ¶ 15. Chueh estimates Plaintiff's total potential lost profits for the years 2003 to 2008 at $7,801,189.50, and Plaintiff requests this amount in lost profits due to Defendants' infringing activity pursuant to 15 U.S.C. § 1117(a).

In support of its calculation of lost profits, Plaintiff cites to a district court case in New York that awarded lost profits after the defendant's default in a trademark infringement action. First Supp. Mem. at 10 (citing *Strippit, Inc. v. Coffee*, No. 09-CV-509A, 2009 WL 3644247 (W.D.N.Y. Oct. 27, 2009). There, the plaintiff manufactured products for the sheet metalworking industry, marketed them with a registered trademark, and sold them through a website featuring the trademark. *Id.* at *1. The defendant, with knowledge of the plaintiff's business, registered an infringing domain name and sold competing products using the plaintiff's mark. *Id.* Due to the defendant's default, the plaintiff established its lost profits by submitting evidence of steady sales during normal economic times that declined after the defendant began operating the infringing website. *Id.* at *4. The court noted the difficulty of determining lost sales caused by infringing conduct and found that a court may "engage in some degree of speculation in computing the amount

United States District Court

For the Northern District of California

of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing." *Id.* at *3 (quoting *PPX Enters., Inc. v. Audiofidelity Enters.*, 818 F.2d 266, 271 (2d Cir. 1987) (quotation marks omitted)).  The court awarded lost profits based on the plaintiff's showing of declining revenue because the plaintiff provided a pre-infringement "base-line" of revenue that indicated what revenue the plaintiff would have generated absent the infringement. *Id.* at *4.

Here, Plaintiff has not given a pre-infringement baseline and instead uses "other users" (customers who reached Plaintiff's website through means other than an Internet search engine) and their rate of annual increase as its baseline.  However, no evidence is provided to indicate that it is reasonable to assume that Plaintiff's search engine users would have increased at the same rate as Plaintiff's other users.  The Court is not persuaded that Plaintiff has provided a "reasonable basis for computation" of its lost profits. *Lindy*, 982 F.2d at 1407.  Plaintiff's request for damages in the amount of $7,801,189.50 is therefore DENIED.

### ii)    Statutory Damages

As an alternative to seeking damages in the form of lost profits, a plaintiff may elect to receive an award of statutory damages in trademark actions involving the use of a counterfeit mark. 15 U.S.C. § 1117(c).[4]  Under the Lanham Act, a court may award "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *Id.* § 1117(c)(1).  A "counterfeit mark" means "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use," and at least one court has found the unauthorized use of a mark in a domain name qualifies as a counterfeit. *See PetMed Express Inc. v. MedPets.com, Inc.*, 336 F. Supp. 2d 1213, 1221 (S.D. Fla. 2004).  A court may grant enhanced damages of up to $2,000,000 per counterfeit mark on a finding of willful infringement. *Id.* § 1117(c)(2).  Willful infringement occurs when the defendant knowingly and intentionally infringes

---

[4]The Lanham Act also provides for statutory damages in cases involving cybersquatting pursuant to 15 U.S.C. § 1117(d).  Because the Court is providing statutory damages for the same conduct under § 1117(c), the Court declines to grant additional statutory damages under § 1117(d).

**United States District Court**
For the Northern District of California

on a trademark.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003).  Willfulness can also be inferred from a defendant's failure to defend.  *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003).  If statutory damages are elected, a court has wide discretion in determining the amount of statutory damages to be awarded.  *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham*, 259 F.3d 1186, 1194 (9th Cir. 2001).

Here, Plaintiff requests an award of statutory damages under § 1117(c) if the Court will not grant an award of lost profits under § 1117(a).  Plaintiff has alleged that Defendants intentionally infringed Plaintiff's marks with knowledge that the marks were used to identify Plaintiff's products and services.  Compl. ¶ 15, 40.  When contacted by Plaintiff, Quimby offered to stop routing customers through the domain names to Defendants' websites if Plaintiff would agree to advertise Defendants' products and services.  Compl. ¶ 20.  Defendants have also failed to defend this action.  Defendants' infringement is therefore willful and Plaintiff may request an award of enhanced statutory damages.  Accordingly, this Court recommends entry of a monetary judgment in favor of Plaintiff in the amount of $200,000 per domain name for a total of $400,000 in statutory damages based on trademark infringement.  *See Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 852-53 (E.D. Mich. 2006) (awarding the maximum amount of statutory damages available for non-willful infringement (then $100,000) for defendants' willful maintenance of an infringing domain name and operation of an infringing website despite receipt of actual notice that their actions were unauthorized); *PetMed Express*, 336 F. Supp. 2d at 1221 (finding defendants' infringing domain names to be counterfeit marks and awarding $400,000 in statutory damages for each domain name based on defendants' willfulness and "the fact that these marks appeared on the Internet, thereby reaching a substantial number of customers").

### 4.     Attorneys' Fees

Plaintiff seeks an award of attorneys' fees in the amount of $32,096.50 pursuant to 15 U.S.C. § 1117(a)(3).  Second Weber Decl. Supp. Default J. ¶ 10-11.  This amount is based on the time spent by attorneys Aaron McClellan, Peter Weber, and James Monagle.  Declaration of Peter L. Weber in Support of Plaintiff's Motion for Default Judgment and Permanent Injunction ("Weber Decl. Supp.

United States District Court

For the Northern District of California

1   Default. J.") ¶ 21.  The respective billing rates of these individuals is $325.00 per hour, $210.00 per

2   hour, and $210.00 per hour.  *Id.*

3          Under the Lanham Act, attorneys' fees should only be granted in "exceptional" cases.  The

4   Ninth Circuit has held that "exceptional" refers to those cases where the defendant's behavior has

5   been malicious, fraudulent, deliberate, or willful.  *See Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378,

6   1384 (9th Cir. 1984); *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir.

7   1982).  Willful infringement occurs when the defendant knowingly and intentionally infringes on a

8   trademark.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003).

9   Willfulness can also be inferred from a defendant's failure to defend.  *Philip Morris USA, Inc. v.*

10  *Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003).  Here, Plaintiff has alleged that

11  Defendants knowingly and intentionally infringed on Plaintiff's marks and Defendants have failed to

12  appear and defend this action.  Because Defendants' conduct is willful, Plaintiff is entitled to an

13  award of attorneys' fees.

14         The starting point for determining reasonable fees is the calculation of the "lodestar," which

15  is obtained by multiplying the number of hours reasonably expended on litigation by a reasonable

16  hourly rate.  *See Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987) (citing *Hensley*

17  *v. Eckerhart*, 461 U.S. 424 (1983)).  In determining a reasonable number of hours, the court must

18  review detailed time records to determine whether the hours claimed by the applicant are adequately

19  documented and whether any of the hours claimed by the applicant were unnecessary, duplicative or

20  excessive.  *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *reh'g denied,*

21  *amended on other grounds*, 808 F.2d 1373 (9th Cir. 1987).  To determine a reasonable rate for each

22  attorney, the court must look to the rate prevailing in the community for similar work performed by

23  attorneys of comparable skill, experience and reputation.  *Id.* at 1210-11.

24         Here, the Court finds the rates charged are reasonable.  Further, having carefully reviewed

25  the time sheets provided by Plaintiff, the Court concludes that the time spent was reasonable.

26  Therefore, it is recommended that Plaintiff be awarded $32,096.50 in attorneys' fees.

27         **5.     Costs**

28         Under the Lanham Act, a plaintiff that prevails on a claim under § 1125(a) is entitled to

**United States District Court**
For the Northern District of California

costs. 15 U.S.C. § 1117(a).  Plaintiff has prevailed on its unfair competition claim under § 1125(a), therefore plaintiff is entitled to costs.  Plaintiff states that it has incurred costs in the amount of $1,619.26 related to service of process on Defendants, research fees, and filing fees and has submitted invoices describing the costs incurred.  Second Weber Decl. Supp. Def. J. ¶ 10 & Ex. A. The invoices list the following costs: (1) $675.70 for legal research on Westlaw; (2) $390.00 in filing fees; (3) $120.00 for delivery of documents to the Court; (4) $275.00 for service of documents on Quimby; (4) $6.79 for postage; (5) $81.83 for long distance telephone calls; and (6) $24.50 in travel expenses.  Second Weber Decl. Supp. Def. J. Ex. A.

Under Civil Local Rule 54-3, an award of costs may include the clerk's filing fee and fees for service of process "to the extent reasonably required and actually incurred."  Therefore, Plaintiff's costs of $390.00 in filing fees and $275.00 for service to Quimby, totaling $665.00, are allowable. Additionally, because postage and delivery expenses are routinely billed as a part of attorneys' fees, it is recommended that the request for $6.79 for postage and $120.00 for delivery expenses be awarded.

The Court considers legal research fees, such as Westlaw fees, to be overhead and not properly considered costs that may be awarded.  *See Cairns v. Franklin Mint Co.*, 115 F. Supp. 2d 1185, 1189 (C.D. Cal. 2000); *United States v. Merritt Meridian Constr. Co.*, 95 F.3d 153, 172 (2d Cir. 1996); *BD v. DeBuono*, 177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001).  Similarly, the Court considers expenses incurred as a result of long distance telephone calls to be overhead not properly included in an award of costs.  It is therefore recommended that Plaintiff's request for $675.70 in legal research fees and $81.83 in long distance charges be denied.  Further, the cost of travel is generally not a recoverable cost, therefore it is recommended that Plaintiff's request for $24.50 in travel expenses also be denied.  *See Banta v. City of Merrill*, No. 06-3003-CL, 2007 WL 3543445, at *5 (D. Or. Nov. 14, 2007).

It is therefore recommended that Plaintiff be awarded $791.79 in costs.

## IV.     CONCLUSION

It is recommended that the Court GRANT the Motion in part and DENY the Motion in part. Default judgment should be entered against both Defendants on Plaintiff's trademark infringement,

unfair competition, false advertising, and cybersquatting claims.  Plaintiff's request for lost profits should be denied, but the Court should awards $400,000 in statutory damages on the basis of Defendants' trademark infringement for which Defendants shall be jointly and severally liable.  It is further recommended that Plaintiff's request for attorneys' fees in the amount of $32,096.50 be granted, and that Plaintiff's request for costs totaling $1,619.26 be denied.  The Court recommends that Plaintiff be granted a reduced award of costs of $791.79.  Finally, a permanent injunction should be entered against Defendants as follows:

> Defendants, their officers, agents, servants, attorneys, employees, privies, successors and assigns, and all holding for and through them, and all persons in active concert or participation with any of them be enjoined from:
>
> > a. Using, displaying, advertising, copying, registering, imitating, or infringing upon the RingCentral Marks;
> >
> > b. Using or displaying the RingCentral Marks or name or colorable imitations thereof as a business name, domain name or mark in any written, oral or electronic advertisements, including on its www.tollfreenumbers.com website and any other websites owned and/or controlled by Defendants;
> >
> > c. From using RingCentral or any other word that is confusingly similar to RingCentral as or as part of any trademark, service mark, brand name, trade name, or other business or commercial designation, in connection with the sale, offering for sale, distribution, advertising or promotion of any product or service;
> >
> > d. Making representations that Defendants' products or services are in any way sponsored, approved, authorized or affiliated with Plaintiff;
> >
> > e. Otherwise infringing upon Plaintiff's RingCentral Marks.

Dated:  February 26, 2010

_____
JOSEPH C. SPERO
United States Magistrate Judge